At this time, we'll hear Rosen v. Prudential Retirement Insurance. Good morning. Good morning, Your Honors. May it please the Court, I'm Monique Olivier and I represent the appellant, Richard Rosen. In light of the standards that the District Court was obligated to apply in considering Prudential's motion to dismiss, the Court erred in several respects which require reversal. I'd first like to turn the Court's attention to the issues with respect to the separate accounts and then talk about the fiduciary status in the trusts. With respect to the separate accounts, the District Court erred in finding that there were no plausible allegations of breach. The District Court found fiduciary status with respect to the separate accounts, but then failed to conduct the appropriate analysis of the allegations. Instead, it concluded that revenue sharing generally does not violate the duty of prudence. Well, you don't disagree with that, do you? We do not disagree. Our allegations with respect to revenue sharing are not revenue sharing as a general matter in the marketplace. It's the way that Prudential uses revenue sharing in this type of case, where it is receiving indirect compensation in a way that could put it in a conflicted position in the trusts and in the separate accounts. That would be in the case of separate accounts that have mutual funds, but you were confronted with the problem that there was irrefutable evidence, the forms, that showed that the separate accounts were not invested in mutual funds. I'm glad you brought that up, Your Honor, because I think that is a critical misunderstanding in the record and a misunderstanding that the District Court had below. The complaint very clearly sets out definitions of mutual funds and revenue sharing. When we are talking about mutual funds, as it is defined in the complaint, it is not limited to 40 ACT funds. It includes mutual funds, affiliates of mutual funds, sub-advisors, separate accounts. It includes that whole body of investment vehicles. Revenue sharing is defined as well as basically any indirect compensation. Did you allege that any of those other vehicles were employed in the separate accounts? Absolutely, Your Honor. I can point the Court to specific paragraphs that allege that, but there are allegations throughout the complaint that talk about how the separate accounts function. They have sub-accounts and sub-advisors. Our allegations are, in those contexts, you have circumstances where the sub-advisors are making payments of indirect compensation to Prudential in a way that impacts the assets in that account and puts Prudential in a conflicted position. The fact that the separate accounts don't have 40 ACT funds does not resolve that question. In fact, if you look at the form 5500s, there is specific confirmation that Prudential, in fact, receives indirect compensation. I would like to just point the Court to the joint appendix at 185.190. Why don't you start with the volume number because we have a bunch of them here. It's volume one, right? Yes, it's volume one. 185? 185 is one example. That's for one year. There's also 198 and 332. 185? Yes, Your Honor. Okay. What am I supposed to look at here? If you look to the middle of the form 5500, the reporting of the receipt of indirect compensation, you see PREACT, Prudential Retirement, listed in the middle of the form. Then if you look at the sub-column E, did the service provider receive indirect compensation? The box is checked yes. That occurs year after year. I'm sorry. I don't see what you're talking about. We're at JA0185, right? Right. Where's box E? I'm sorry, Your Honors. If you turn to JA198. Is that all part of the same form? My apologies. It's a form 5500, but it's for a different year. Oh, it's for a different year. All right. We're at JA198. Where are we looking? If you look in the middle of the page, you see Prudential Retirement Insurance. Then if you look at column E, did the service provider receive indirect compensation? No. Yes. You're under B. The first one refers to CAP Financial. The middle row refers to PREACT. Where does this form say what is the nature of it or the extent of it? Does this form say it? It does not say. It indicates that there was a breach of loyalty. The basis for our claim are the detailed allegations that we set forth in the complaint. What did they receive? They received indirect compensation. I understand that, but what did they get? What did they get that I would like to have? They received payments. They received payments from sub-advisors of the separate accounts. Payments in money? Payments in kind? Payments in stock? What do we know? We don't know. We know it's indirect compensation that's usually in the form of revenue sharing. Is there any law against getting indirect compensation? There is law against receiving indirect compensation when it puts the person receiving the compensation in a conflicted position. If you're a fiduciary . . . How and where do you allege that this indirect compensation put them into this conflicted position? I'm happy to walk you through the allegations in the complaint. That's what we're talking about here. If you look at . . . There's two different issues. There's the separate accounts and the trust. If you look at the separate accounts . . . What did you concentrate on the separate accounts? Absolutely, Your Honor. If you look at Paragraphs 8 . . . What page? What volume and what page? It is Volume 1 at Page 25 of the Joint Appendix. That puts forth that Prudential uses its ownership and control over the separate accounts. Paragraph 8. Correct. From the receipt of the revenue sharing payments from mutual funds . . . Now remember, mutual funds is earlier defined as a broader term than a 40-act fund. The revenue sharing payments have the effect of increasing the expense ratios of the funds, and those expenses are generally deducted directly from the retirement assets of the separate accounts. That allegation repeats throughout the complaint. If you look at Paragraph 45 and Paragraph 47, which are on Pages 37 to 38, and then if you turn to the charge in the complaint . . . Well, isn't that always the case, that if someone investing on one's behalf receives compensation, whatever that compensation is, the beneficiary would have gotten more if they didn't get that compensation? Right. That's just a truism. That's what you're really arguing, and now you're saying that they got other payments, and then you're arguing as a truism that if they didn't get it, the beneficiaries would have reaped that benefit. But I'm not sure I understand why Prudential can't get paid on whatever basis. What is the claim that that's wrong, or that that's illegal, or a breach of loyalty? We are not claiming that Prudential does not have a right to get paid. We appreciate that that would be the case in structure. Okay, so why can't they get paid based on revenue sharing? Let's take it bluntly. Because this is in the context of ERISA, and this is in the context where ERISA provides specific protection against self-dealing and conflicts of interest. And in a situation . . . there are ways to do revenue sharing lawfully. There are companies like Aon Hewitt and Empower, and they do have revenue sharing, and they do it in a way that's lawful because they provide a dollar-for-dollar credit back to the accounts, back to the plans. Our allegations here is that that is not what's occurring. And where would I look to find a case that says it's illegal to do it if you don't provide a dollar-to-dollar credit back to the accounts? The primary source of a law on those points would be the Aetna letter and the Frost letters that were issued. Both of those letters, which we discuss in detail in our briefs, outline the circumstances in which revenue sharing could present a conflict of interest or not. What we're asking this court is, we need to get past the pleadings phase to examine exactly what is happening. One of the key things we do not have, the documents that we are missing, are the participation agreements. Those participation agreements will indicate exactly what indirect compensation is paid. But we are only at the pleading stage, and we have alleged the appropriate allegations with respect to indirect compensation. The district court found that there was a fiduciary duty with respect to the separate accounts, and then failed to do the appropriate burden shifting analysis under Loewen. There wasn't a wave. I think what the district court said was you didn't plausibly plead that, absent the mutual fund, that there was some other relationship to the indirect compensation. Well, I think there's two points. So he or she didn't have to get to the burden shifting, because once the mutual funds are out, and it's clear to me, at least, that if the mutual funds were in, you've got a great argument, because they're inherently conflicted, because this is the one area where they get to select the pool of investment opportunities, whereas they don't in the other areas. They're not a fiduciary. But you haven't shown that these other investment opportunities, or the court felt you didn't plausibly plead that these other investment . . . You always say mutual funds or other related activities or other related investments. You don't really put any meat on the bones of what those other things are. Do you? I disagree, Your Honor. I think the allegations in the complaint make it very clear what we're talking about, that we're not talking about a traditional 40-act fund. That may be one instrument, but we are also talking about . . . And if you look at the definition in the complaint, it's in the first few paragraphs. Mutual fund is described in paragraph 3 on page 24 to include affiliates of mutual funds, mutual fund advisors, sub-advisors. That same context, the same idea of revenue sharing takes place in that context. So the district court got that point wrong, and then the district court also failed to analyze, which Prudential admits, the duty of loyalty or the prohibited transactions . . . You've reserved three minutes for rebuttal. Thank you, Your Honor. I will hear you then. Thank you. Good morning. Good morning. May it please the Court, I'm Catherine Carroll on behalf of the Prudential Appellees. Your Honors, the district court correctly dismissed the amended complaint in this case because it fails to plausibly allege that Prudential was acting as a fiduciary, that is, performing a fiduciary function when it received the complaint, and that's why I'm here today. I'm here today because I want to clarify the distinction between, on the one hand, Prudential's role as a directed trustee under the trusts, and on the other hand, its role with respect to the separate accounts. Let's talk about the separate accounts. So with respect to the separate accounts, as Judge Wesley observed, and as Mr. Rosen conceded in the district court, it is one of the most popular instruments kind of theory, and there are essentially two problems with that theory, broadly. One problem is that it's not adequately alleged or not plausibly alleged, and one problem, that even if it were, nonetheless, as a matter of law, there was no exercise of fiduciary control. But your adversary says it's properly alleged because it's built into the definition of mutual funds. That is the theory, and that is essentially the one place in the complaint. They're entitled to their theory. We're at the pleading stage. Correct. So let me break down the similar instruments into two types. One is some of the items listed in the paragraph 3 definition are investment vehicles that I think one could indeed think of as similar to mutual funds, so things like other pooled separate accounts, common collective trusts, and so on. In fact, the Form 5500s make irrefutably clear that there were no investments in those type of vehicles in the exact same way that there were no mutual funds. And where that information is available is in the Schedule H's to the 5500s that were submitted by the pooled separate accounts. So the way this works is... Do you have a page at the joint appendix? Yes. So there's an example page at page 1900 of the joint appendix. Yes, 1900. What volume are we in here? It's probably close to volume 10, isn't it? It's probably... Is it volume 7? I'm sorry? Volume 7? Yeah, it is. And it's 1900, you said? Yes. Page 1900 shows an example of one of the Form 5500s that were submitted by the pooled separate accounts. So the plan every year must file its own Form 5500s, and then each of the individual separate accounts annually must also file its own Form 5500s. And those forms state how the assets in each of those accounts were invested. And where that's done is particularly in Schedule H. And we've given in a footnote in our brief a citation to each of the Schedule H's for every year of the class period. So looking at the example at page 1900 of the joint appendix, this is the pooled separate accounts' own report of how the assets in that account were invested. And under assets, you can see that this particular pooled separate account had investments in, among other things, interest-bearing cash and preferred or common stocks. And other. Below that, you see... There's receivables. Blank lines indicating did you have investments in mutual funds, as well as all these other sorts of similar entities, other pooled separate accounts, common collective trusts, other sorts of registered investment companies or investment entities. So anything that is a quote-unquote similar to a mutual fund. One second. Give us some help. What page and where on the page? So I'm looking at page 1900 of the joint appendix in Volume 7. This is Schedule H to one of the forms submitted by one of the pooled separate accounts. This schedule the separate account uses to report how its assets were invested throughout the reporting year. You were describing some things. Where on that page? So if you look down, there's this table. It's titled Asset and Liability Statement, Part 1. Underneath of that, there's a list of all the different kinds of assets in which the account could be invested. And there's a heading C, General Investments. And then under C, there's 15 possible entries. Correct. It shows that it was invested in general investments below that. Correct. It included value of interest in master trust investment accounts, value of interest in separate accounts. That's 10. Yes. In other words... You're saying that the report wasn't anywhere other than in corporate stock. Exactly. In other words, in the same way that Mr. Rosen conceded that these undisputed documents show no true 40 Act mutual fund investments, they also show for the exact same reason no investments in similar instruments. Now, I think the subadvisor... Let's assume that in buying common stock, your client received indirect compensation for buying that stock. Because that's what I see on page 198. Let's put all this together. Let's just say that they could have bought these reputable things. Instead, they bought Russian gold mines. So there's no dispute that there were indirect compensation paid. It's not surprising that we would see that reported on the pages that Ms. Olivier referred to. Because there were mutual fund investments on the trust side of the House. The point for fiduciary purposes is that... The difference there is that the Ferguson Pickett... Exactly, Your Honor. We're not denying that there were mutual fund investments. There's no fiduciary function as to those investments or the indirect compensation that they generated. Because the trust agreement makes clear that Prudential was acting as a directed trustee within the meaning of Section 1103 of ERISA. So the indirect compensation is... So you were saying that when I'm looking at page 198, I am looking at a return that deals with the trust compensation. Exactly. And I should also, just for clarity, what you see reported there on the Schedule C is only the indirect compensation that isn't already reported elsewhere. So that doesn't completely capture all of it. The DOL requires the indirect compensation to be reported in a form called a 408B2. And there's no allegation here that those disclosures were not made. And so the way this works is that before any contract is entered into between the service provider and the plan, DOL requires that the service provider disclose to the plan all of the information about the many hundreds of investments in its big menu, including whether it gets revenue share or other indirect compensation. It's then up to the plan, in this case Ferguson, acting with the advice of CAP Financial, to decide, do I want to engage the service provider on those terms? And how do I want to compensate them? Do I want to compensate them by charging a fee to my participants? Do I want to compensate them by a fee straight from the plan? Or do I want to compensate them based on... by choosing mutual funds in the lineup that are going to generate a certain degree of indirect compensation? And here Ferguson did choose on the trust side directed prudential to make certain mutual funds available. On the separate account side, for the reasons we've shown, there were no mutual funds. Mr. Rosen conceded that below. The subadvisor theory, I think, is even less plausibly alleged because you can't invest in a subadvisor. A subadvisor is a subcontractor. It's not an indirect compensation. It's direct. So that's even less plausibly alleged. But I'd like to address the even-if question. Suppose there were investments in mutual funds or some other kind of something that   resulted in indirect compensation within the separate accounts. The reason why Judge Bolden was correct, nonetheless, to find as a matter of law no fiduciary violation is because the standard under the Supreme Court's test in Pegram requires the plaintiff to establish at the threshold—this is not a burden-shifting question—at the threshold, the first issue is, was the defendant acting as a fiduciary when it received the revenue-sharing payments here? And what's been alleged in this case is that to the extent there were any investments in mutual fund-like things in the separate accounts, that happened for two reasons. One, because Ferguson selected those accounts to be included in the lineup, and two, because a plan participant directed Prudential and said, I want my money to go into the account that mirrors mutual fund ABC. And Prudential followed that instruction and executed the allocation for the— Are you speaking of the trust accounts here? Pardon? I'm speaking about—well, that's true across the board, but I'm addressing particularly the separate accounts and the similar instruments theory. You're saying, then, in the separate accounts, it's Ferguson or the individual employee of Ferguson who had an employee account who directed which mutual funds or investments should be used. Yes, that's correct. That's the allegation. Well, then what's the difference between the separate accounts and the trust? That's where I'm going with this. We don't think there meaningfully is one, and I think, if I may just complete the— Go ahead. Complete the thought. I think that even on the separate account side, the plaintiffs point to language in the separate account rider that gives Prudential discretion to select the managers for the separate accounts. The problem is that under PGRM, there has to be a nexus between the conduct being complained of and the fiduciary role. Mr. Rosen's not suggesting that Prudential imprudently chose a bad manager or otherwise imprudently mismanaged the assets in the separate accounts. The allegations are about revenue sharing, and Ms. Olivier referred to the Aetna letter earlier. I think it's the issue of the breach of the duty of loyalty. Well, exactly. By getting paid on the back end. Exactly, and if I may refer to the Department of Labor's Aetna letter, the Department of Labor—and by the way, in the Aetna case, there was no crediting one-for-one of anything. That was only true in Frost. In Aetna, the DOL wrote—and I'm just quoting—if a fiduciary does not exercise any authority or control to cause the plan to invest in a mutual fund, then the mere receipt by the fiduciary of a fee or other compensation from the mutual fund in connection with the plan's investment would not in and of itself violate ERISA. In a sense, it's when the fiduciary is the one who's picking it and is conflicted because they're going to get something back for having picked it. They know that they're enriching themselves while advising someone else. That would be—yes, and those were the facts in cases like Haddock and health care securities. Here, the record is indisputably clear that the decisions were made by the plan, advised by CAP Financial, and by the plan participants. So this puts this case more in line with cases like the Aetna letters, cases like this Court's decisions in Lopresti and Finkel, which recognize that what really matters for ERISA purposes is who is making the decision. Even if, as in Lopresti and Finkel, even if I'm the one signing a check, carrying out a decision made by someone else, I am not exercising fiduciary control by doing so, and that's what's happening here, and that's the basis for the decisions in Limeculer. Then let me ask you this. I mean, if an individual employee directs that your client invest her funds in Crestron mutual funds, and Crestron pays your client a lot of money, why should your client be able to keep that? Why not take that and pass it along to the person whose investment this is? Because the service provider in that circumstance is not acting as a, is not performing any fiduciary function, because a plan... Well, if you get money that belongs to somebody else, why doesn't that make you a fiduciary? Not if, because being a fiduciary doesn't turn on whether you're getting money. It turns on whether you are exercising a function that's laid out in the statutory definition, and the one that's relevant here is, are you exercising control over the management of the assets? When a plan here, the plan sponsor Ferguson, who no doubt is a fiduciary, along with the advice of their investment manager, decides, I want to engage the ACME 401k service provider, and I don't want any of my participants to have to pay any direct fees at all. I want ACME to be compensated entirely through revenue sharing. I know what all the revenue sharing is for all of the funds in the lineup, because I've been giving the disclosures. There's disclosure requirements on these. Exactly, and to be clear, those disclosures have to be made before the contract is entered into, and so the plan, of course, has a fiduciary obligation of prudence. If the client knows it, then the plan has decided that this is the way in which your client is going to receive some or all of its compensation. Exactly, and here Mr. Rosen brought claims against Ferguson and Cap Financial saying it was imprudent for you to do so. The district court rejected those, and he's not appealing that decision. Thank you. We'll hear rebuttal. Thank you, Your Honor. With respect to the form 5500, Prudential's counsel simply just does not have a response to the fact that those forms indicate that Prudential received indirect compensation, and those forms are not related to the trust. They are only related to the separate accounts, so if you look at, again, volume one of the joint appendix. But how would you establish that? Because on the face of it, I can't see what they're related to. If you look at joint appendix page 203, that's in volume one, that lists out the separate accounts. That makes it clear that the form 5500s that were submitted only pertain to the separate accounts, so you go from there to the fact that there is a box check saying that Prudential receives indirect compensation. That, combined with the allegations of our complaint... That's a different form than the Schedule C to which you directed our attention, which contains the paragraph E. That's correct. It's the Schedule D to the form 5500. So it lists the assets, and it lists only separate accounts. It does not list the trust assets. Walk us through this. Schedule D, right? Page 203. Where? So if you look down the page, each of the instruments that are listed are the separate accounts. There's no mention there of the mutual funds held by the trust. There's no mention where? In the left-hand column? Correct. I think that one of the points that I want to bring this Court's attention to is the fact that there's a lot of confusion about why are we having this discussion at the motion to dismiss stage. It would be one thing to look at the contractual documents and make a determination and have that be part of the complaint on the motion to dismiss. Let me ask you about that. You seemed to indicate earlier, and you're resorting to the same argument now, quite plausibly perhaps, you feel aggrieved by some inability to present a full record to the District Court. Is that right? That's correct, Your Honor. And what was the opportunity of which you were deprived? The primary opportunity would be to get into discovery and look at, for example, the participation agreements. And why are the agreements unavailable? Because they were not produced by Prudential in any pre-litigation proceeding. So we do not have access to those documents. And those documents are the contracts between . . . You have no right to have access. That's correct, Your Honor. And going again to one of the points that was made by my colleague, in terms of how the payment flows, we have the separate account e-writer that makes it very clear that there is fiduciary status in PREAC over the separate accounts. PREAC hires the sub-advisors. They get paid to do that. That's the indirect compensation that we're talking about. And to the extent that that payment results in a . . . Who gets paid to do that? Prudential gets paid by the sub-advisors to have those assets listed as part of the plan assets. That's where the indirect compensation takes place. Wait a second. Unless someone's actually chosen . . . The fact that they may have some arrangement prior to Ferguson picking them doesn't make them a fiduciary or a breach of a fiduciary duty. This is a post-contractual act. And what's your basis to have alleged that it existed? Because that's how participation agreements work. No, no, no. That's not what I asked you. What was the premise by which you made that factual assertion that those things existed? What document did you look at that told you that they existed? We did a 104 demand. We did not receive the participation agreements, but we received the documents to demonstrate that there are . . . Checking of this box on page J198, did service provider receive indirect compensation that they checked yes? That's your premise, that there were sub-advisor agreements or something? That is part of the premise, but we know just by virtue of the fact of the way these separate accounts function that there are agreements between . . . widely available about how these separate accounts work. Prudential has a tremendous amount of public . . . In response to the other document that appears at the schedule that showed that all the separate accounts were invested in corporate stock and it wasn't invested in any other investment vehicle. Right, but even if that's the case, those securities are held in an account. That account is managed by somebody. In order for that account to be listed as part of the plan assets, it pays Prudential to list the account. It pays to be included in the options of plan assets. This isn't something that's directed by the participant in the moment. This is post-contractual conduct that is occurring on an ongoing basis. Let me understand further your aggrievement here. We have eight volumes of documents before us. How did we come to have these documents if you haven't had discovery? Because Prudential submitted them in support of its motion to dismiss, Your Honor. So we have had no opportunity to test the documents. You submitted all of this stuff out of the goodness of their minds. You submitted questions about the form 5500s to obtain the participation agreements. In this instance, you have the district court finding fiduciary status with respect to the separate accounts. So they've produced eight volumes, enormous volumes here, and you think you didn't get enough. You asked for those other documents that you didn't get? There's no discovery. I know there's no discovery, but I'm sure there are phone... That's why Alexander Graham Bell lived. Somebody had a conversation that you're about to receive eight enormous volumes of documents, right? Yes. And when you got it, did you then say to yourself, gee, I don't have the X? They were requested by counsel. That's all I'm asking, sure. I'm not saying it's a formal request. Yes, they were requested and they were not produced. Thank you. Thank you, Your Honor. Thank you both.